*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0420p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KUMAL BURTON,

> *Petitioner-Appellant,*

*v.*

No. 02-2489

PAUL RENICO, Warden,

> *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 01-10287—David M. Lawson, District Judge.

Argued: August 11, 2004

Decided and Filed: December 6, 2004

Before: SILER, MOORE, and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** James Sterling Lawrence, Detroit, Michigan, for Appellant. Debra M. Gagliardi, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** James Sterling Lawrence, Detroit, Michigan, for Appellant. Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. On May 26, 1995, Petitioner-Appellant, Kumal Burton, was convicted of first-degree murder in violation of Mich. Comp. Laws § 750.316 and possession of a firearm during the commission of a felony in violation of Mich. Comp. Laws § 750.227b. On June 28, 1995, Burton was sentenced to life imprisonment for his first-degree murder conviction and two years' imprisonment for the firearm charge. Burton now appeals the district court's decision denying his petition for a writ of habeas corpus. We **AFFIRM**.

### I. BACKGROUND

Burton's convictions arise from the June 3, 1994 shooting death of Sherman McClayton in the parking lot of the Black and Tan Bar in Lansing, Michigan. At some time before 2:00 a.m. on June 3, 1994, Burton and McClayton had a disagreement at the Black and Tan Bar, with McClayton apparently telling Burton (a Detroit resident) that he did not like people from Detroit. Later, at around 2:00 a.m., Burton arrived at the West Lapeer Street residence of Markita Robinson. Markita Robinson and her sister, Nikita

1

Robinson, testified that Burton retrieved a firearm from the residence and said he was going to kill McClayton. Burton then left the residence and drove back to the Black and Tan Bar. When Burton arrived, several people were standing in the parking lot near a food truck selling chicken. Burton parked his car and stepped out of the vehicle. Burton and McClayton frowned or scowled at one another, and then Burton fired several shots at McClayton, got in his car, and drove away. Burton returned to the West Lapeer residence around 2:30 a.m., told the Robinson sisters that he had killed McClayton, and asked the Robinsons to take the gun, which was hot and smelled of smoke.

Several months later, in September 1994, Burton and an acquaintance, Jackie Robinson Harris, were watching television when a news broadcaster announced that Burton was the shooter in the McClayton incident. Upon hearing the announcement, Burton grabbed his keys and left, saying, "I'm out of here." Later that evening, Burton said he was returning to Detroit. Burton was subsequently arrested in Detroit in December 1994, and on January 11, 1995, the State of Michigan filed an information charging Burton with first-degree murder and possession of a firearm during the commission of a felony.

Following Burton's arrest, George Zulakis, a court-appointed attorney, was assigned to represent Burton. On January 20, 1995, Ingham County Circuit Court Judge Carolyn Stell set the case for trial on February 27, 1995. Burton's family collected the funds necessary to retain private counsel for Burton, and on January 26, 1995, Thomas Warshaw filed with the Ingham County Circuit Court a notice of his substitution as counsel in place of Zulakis.

In early to mid February 1995, Warshaw filed a motion with the Ingham County Circuit Court to adjourn trial. Warshaw, apparently unaware of the court's procedural rules, failed to contact the court clerk to set a hearing date for the motion, and the motion was not heard until February 22, 1995, which was only five days before Burton's scheduled trial date and was the last day when pre-trial motions would be heard. During the hearing on the motion to adjourn, Warshaw stated that he would need additional time to prepare, particularly in light of discovery materials he had only recently received from Zulakis. Although the prosecution stipulated to the adjournment, Judge Stell denied Warshaw's motion. Warshaw then moved to withdraw from the case, and Judge Stell granted his motion. Burton was not in attendance at the motion hearing.

For unknown reasons, Burton's trial did not commence on February 27, 1995 as scheduled. Rather, on March 16, 1995, Judge Stell recused herself, and the case was reassigned to Judge William Collette. On May 11, 1995, Judge Collette heard the prosecution's Motion to Clarify Defendant's Representation. At the hearing, Judge Collette offered to adjourn trial so Burton could retain other counsel. Burton declined, however, stating that he liked his current court-appointed counsel, Joseph Brehler, and that Warshaw was no longer available because Burton lacked the funds to retain Warshaw and because a disagreement with Warshaw had since developed.

Burton's trial commenced on May 22, 1995. Burton did not take the stand. A jury convicted Burton on both counts, and he was sentenced to life imprisonment for first-degree murder and two years' imprisonment for possession of a firearm during the commission of a felony.

Burton appealed his conviction to the Michigan Court of Appeals, alleging that: (1) Judge Stell's refusal to grant a continuance violated his right to counsel under the Michigan and U.S. constitutions; (2) the trial court erred in not instructing the jury regarding the lesser-included offense of voluntary manslaughter; (3) he had been deprived of his constitutional right to a jury drawn from a fair cross-section of the community; (4) the prosecution deprived him of his right to a fair trial by using false and perjured testimony; and (5) the cumulative effect of the aforementioned trial errors deprived him of his right to a fair

trial.[1] The Michigan Court of Appeals denied Burton's appeal and affirmed his conviction on August 22, 1997. The Michigan Supreme Court denied Burton's Delayed Pro. Per. Application for Leave to Appeal, stating in its order that the court was "not persuaded that the questions presented should be reviewed by this Court." Joint Appendix ("J.A.") at 144 (Mich. Sup. Ct. Order July 28, 1998).

Burton next sought post-conviction relief in the Michigan courts, filing a Motion for Relief from Judgment in the Ingham County Circuit Court. Burton asserted several new bases for relief: (1) that he had been denied a fair trial based on the admission of other-acts evidence regarding guns stored at a "safe house" and possible intimidation of prosecution witnesses; (2) that the prosecutor had engaged in misconduct by telling the jury they had a duty to convict and by commenting on defense counsel's failure to say that Burton was not guilty; (3) that the trial court erred in instructing the jury regarding flight; (4) that the trial court provided an erroneous instruction to the jury regarding the elements for establishing murder; (5) that the prosecutor erred in introducing evidence that Burton had been in jail with one of the prosecution's witnesses; and (6) that his sentence constituted cruel and unusual punishment under the Michigan constitution and violated Michigan statutory law. The Ingham County Circuit Court denied Burton's motion on November 22, 1999, stating that:

> Each of the grounds claimed by the Defendant could have easily been raised in the prior appeal filed on behalf of this Defendant. To merely state that prior counsel's failure to raise the points claimed somehow creates good cause would, in and of itself, obviate MCR 6.508(D)(3).

> In addition, the Court finds no merit to the claims as asserted by this Defendant. This Court, after a careful review of the brief of the Defendant and the response filed by the prosecution, does not find that there are any grounds for relief from judgment and, accordingly, the motion is denied.

J.A. at 93-94 (Ingham County Cir. Ct. Op. and Order Nov. 22, 1999). Burton filed a Delayed Application for Leave to Appeal with the Michigan Court of Appeals, which denied relief "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." J.A. at 145 (Mich. Ct. App. Order Jan. 18, 2001). The Michigan Court of Appeals denied Burton's Motions for Rehearing and Leave to File Amended Delayed Application for Leave to Appeal on March 1, 2001. Burton then filed with the Michigan Supreme Court a Delayed Application for Leave to Appeal from the Michigan Court of Appeals's January 18, 2001 decision, which the Michigan Supreme Court denied on the basis that Burton "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." J.A. at 146 (Mich. Sup. Ct. Order July 30, 2001).

Burton then turned to the federal courts, filing a petition for a writ of habeas corpus with the U.S. District Court for the Eastern District of Michigan on August 3, 2001. Burton's petition asserted several grounds for relief: (1) that he had been denied the right to retain counsel of choice; (2) that the trial court improperly admitted other-acts evidence; (3) that the trial judge improperly admitted testimony regarding his pre-trial incarceration; (4) that the trial court gave irrelevant and prejudicial jury instructions regarding flight; (5) that the trial judge omitted from the jury instructions an element of the crime of murder; (6) that the prosecutor engaged in misconduct by arguing to the jury that they had a duty to convict and commenting during closing arguments that defense counsel failed to state that Burton was not guilty; and (7) that his counsel on direct appeal had been constitutionally ineffective. The district court denied Burton's right to counsel of choice claim on the merits, concluding that Burton's right to counsel of choice was preserved when Judge Collette offered to adjourn trial so that Burton could engage new retained counsel. The district court also denied Burton's remaining claims on the basis that Burton had procedurally defaulted such claims by failing to raise them on direct appeal. Because Burton failed to establish cause and prejudice or actual

---

[1]In May 1996, an attorney with the Michigan State Appellate Defender Office filed Burton's Brief on Appeal raising the issues of counsel of choice and voluntary manslaughter instruction. In April 1997, Burton filed an Appellant's Pro. Per. [In Propria Persona] Supplemental Brief asserting the jury selection, prosecutorial misconduct, and cumulative trial errors claims.

innocence, the district court concluded that Burton's procedural default in the state courts barred habeas corpus relief in the federal courts.

The district court granted a certificate of appealability with respect to the issue of whether Burton stated a claim for ineffective assistance of counsel on direct appeal, and if so, whether such ineffective assistance of appellate counsel furnished the cause and prejudice necessary to overcome procedural default. This court then granted a certificate of appealability regarding the merits of Burton's right to counsel of choice claim.

## II. ANALYSIS

Pursuant to 28 U.S.C. § 2253(c), the district court and this court have jurisdiction to certify for appeal issues relating to the denial of a petition for habeas corpus. This court has jurisdiction to hear such appeals, *id.*, and we review de novo district court judgments granting or denying petitions for a writ of habeas corpus. *See McClendon v. Sherman*, 329 F.3d 490, 492 (6th Cir. 2003). Because the district court did not conduct an evidentiary hearing but rather relied on the trial transcript in making its fact findings, we must review the district court's factual findings de novo. *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir.), *cert. denied*, 124 S. Ct. 345 (2003).

When a party seeks a writ of habeas corpus challenging state-court determinations regarding constitutional issues, we presume that the state court's findings of fact are correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). A writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). When a state court has not adjudicated a claim on the merits, we review the issue de novo. *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 1145 (2004) (stating that when "there are simply no results, let alone reasoning, to which this court can defer . . ., any attempt to determine whether the state court decision was contrary to, or involved an unreasonable application of clearly established Federal law would be futile. If deference to the state court is inapplicable or inappropriate, we exercise our independent judgment and review the claim *de novo*.") (internal quotation marks and citations omitted).

## A. Right To Counsel Of Choice

Attendant in the Sixth Amendment right to counsel is the right to secure counsel of one's choice. *Linton v. Perini*, 656 F.2d 207, 208 (6th Cir. 1981), *cert. denied*, 454 U.S. 1162 (1982) ("It is axiomatic that in all criminal prosecutions the accused enjoys the right to have assistance of counsel for his defense, and implicit in this guarantee is the right to be represented by counsel of one's own choice.") (citing *Powell v. Alabama*, 287 U.S. 45 (1932)). The right to counsel of choice is not absolute, however, and "may not be used to unreasonably delay trial." *Id.* at 209.

The Michigan Court of Appeals on direct appeal determined that, while Judge Stell abused her discretion in denying Burton's request for a continuance, Burton's Sixth Amendment rights had not been violated because Judge Collette offered to adjourn trial so that Burton could secure retained counsel:

Defendant first claims his convictions must be reversed because the trial court's refusal to grant a continuance to permit his retained counsel to prepare a defense for trial violated his right to counsel under both the federal and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, §20. Although we agree the trial court abused its discretion in failing to grant defendant's request for a continuance, *People v Wilson*, 397 Mich 76; 243 NW2d 257 (1976), reversal is not mandated in this case. Generally, prejudice need not be demonstrated where a defendant is denied the Sixth Amendment right to counsel of the defendant's choice. See *People v Johnson*, 215 Mich App 658; 547 NW2d 65 (1996) and cases cited therein. However, here, shortly after denying the continuance, the trial judge disqualified herself and the matter was assigned to a different judge who provided defendant the option of adjourning trial to allow him the opportunity to obtain other retained counsel. Defendant declined the offer and stated his satisfaction with his appointed counsel. Thus defendant declined to exercise the very right he now claims he was denied. No reversal is required.

J.A. at 142 (Mich. Ct. App. Op. at 1).

Supreme Court precedent does not dictate a finding that the Michigan Court of Appeals's decision was contrary to or an unreasonable application of clearly established federal law.[2] As the Court noted in *Powell v. Alabama*, a defendant has a right to a "*fair opportunity* to secure counsel of his own choice." 287 U.S. 45, 53 (1932) (emphasis added). The Michigan Court of Appeals was reasonable in concluding that Judge Collette's offer to adjourn Burton's trial so that Burton could arrange for representation by his prior retained counsel provided Burton the fair opportunity to secure counsel of choice required by *Powell*. The record indicates that, ultimately, Burton was not represented by his original choice for retained counsel, Thomas Warshaw, because a personal disagreement developed between the two and because Burton's financial circumstances were such that he could no longer afford privately retained counsel. J.A. at 157-58 (Mot. to Clarify Def.'s Representation at 6-7) (Test. of Thomas Warshaw); J.A. at 161-62 (Mot. to Clarify Def.'s Representation at 10-11) (Test. of Kumal Burton); *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel. The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). Because the Michigan Court of Appeals's denial of Burton's claim was not contrary to or an unreasonable application of Supreme Court precedent regarding the Sixth Amendment right to counsel of choice, federal habeas corpus review affords Burton no relief.

Even if Burton's claim is viewed as a constitutional challenge to the denial of his motion for a continuance, it cannot be said that the Michigan Court of Appeals's decision was contrary to or an unreasonable application of Supreme Court precedent. Denial of a continuance rises to the level of a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'. . . ." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)); *see Ungar,* 376 U.S. at 591 ("These matters are, of course, arguable, and other judges in other courts might well grant a continuance in these circumstances. But the fact that something is arguable does not make it unconstitutional."). The circumstances of a particular case

---

[2] We do not agree with Burton's contention that our decision in *Linton* controls this case. Pursuant to 28 U.S.C. § 2254(d)(1), our review of the Michigan Court of Appeals's decision is limited to whether Supreme Court precedent establishes that Burton's Sixth Amendment right to counsel of choice was violated. In *Doan v. Brigano*, we explained that, "As is dictated by the statute, we may not look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law." 237 F.3d 722, 729 (6th Cir. 2001) (internal quotation marks and citation omitted). Also, because *Linton* was decided prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the deferential standard of review we must apply in this case under § 2254(d)(1) did not similarly constrain the *Linton* court in its habeas review of an Ohio state-court decision.

determine whether the denial of a continuance is so arbitrary as to violate due process. *Ungar*, 376 U.S. at 589 ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."). A defendant must also show that the denial of a continuance actually prejudiced his or her defense. *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003) ("Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefit[t]ed the defense."). While the Michigan Court of Appeals did find that Judge Stell abused her discretion in denying Burton's motion for a continuance, his trial date was in fact pushed back approximately three months as a result of the case being transferred to Judge Collette. After viewing the totality of the circumstances in this case, it cannot be said that Judge Stell's denial of Burton's motion for a continuance resulted in Burton being deprived of his constitutional rights, so the Michigan Court of Appeals's denial of relief on this score was not contrary to or an unreasonable application of Supreme Court precedent.

## B.  Ineffective Assistance Of Appellate Counsel

In denying Burton's petition for a writ of habeas corpus, the district court determined that all of Burton's claims, with the exception of his right to counsel of choice argument, are not subject to federal habeas corpus review because Burton procedurally defaulted such claims. Burton contends that his procedural default should be excused because the default was caused by his counsel's ineffective assistance on direct appeal and because he has suffered actual prejudice as a result of such ineffective assistance. We conclude that Burton's counsel on direct appeal was not so ineffective as to give rise to a constitutional violation and therefore affirm the district court's ruling that Burton's procedural default bars federal habeas relief.

When a criminal defendant has procedurally defaulted his or her ability to obtain federal habeas relief by failing to comply with a state procedural rule, the defendant must show "cause and prejudice" or actual innocence in order to overcome the procedural default. *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (explaining that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default"); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (setting forth "cause and prejudice" test for overcoming procedural default); *Maupin v. Smith*, 785 F.2d 135, 138-39 (6th Cir. 1986) (noting application of "cause and prejudice" test in cases of procedural default and setting forth guidelines for actual prejudice inquiry). As Burton has not sought relief under the actual innocence exception to procedural default, we must determine whether Burton has demonstrated cause to excuse his procedural default and, assuming his constitutional rights have been violated, whether such violations resulted in actual prejudice.

Ineffective assistance of appellate counsel, if it rises to the level of a constitutional violation, can serve as cause to excuse the procedural default of claims brought in a habeas corpus proceeding. *Buell v. Mitchell*, 274 F.3d 337, 351-52 (6th Cir. 2001) ("[The petitioner's] ineffective assistance of appellate counsel claims can serve as cause for the procedural default of his other claims only if [the petitioner] can demonstrate that his appellate counsel was constitutionally ineffective. To do so, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense.") (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under *Strickland*, a petitioner must show that "the performance of counsel fell 'below an objective standard of reasonableness'" and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (quoting *Strickland*, 466 U.S. at 688, 694).

Counsel's decision not to raise an issue on appeal does not violate the Constitution unless such a decision is so suspect as to indicate that the petitioner effectively was without counsel:

In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions. Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation.

*McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000), *cert. denied*, 532 U.S. 958 (2001) (citations omitted). In *Mapes v. Coyle*, we identified eleven factors to be considered when evaluating a claim of ineffective assistance of appellate counsel:

(1)     Were the omitted issues "significant and obvious"?
(2)     Was there arguably contrary authority on the omitted issues?
(3)     Were the omitted issues clearly stronger than those presented?
(4)     Were the omitted issues objected to at trial?
(5)     Were the trial court's rulings subject to deference on appeal?
(6)     Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
(7)     What was appellate counsel's level of experience and expertise?
(8)     Did the petitioner and appellate counsel meet and go over possible issues?
(9)     Is there evidence that counsel reviewed all the facts?
(10)    Were the omitted issues dealt with in other assignments of error?
(11)    Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

171 F.3d 408, 427-28 (6th Cir.), *cert. denied*, 528 U.S. 946 (1999) (citations omitted). Even if the unasserted claims are not frivolous, the requisite prejudice cannot be shown if the claims are found to lack merit. *Buell*, 274 F.3d at 352.

### 1. Admission Of Other-Acts Evidence

Burton first asserts that the trial court erred in admitting other-acts evidence in the form of suggestions by the prosecutor that witnesses had been threatened and that a residence connected to Burton was a "safe house." For the admission of evidence to violate constitutional due process, it must be shown that admitting the evidence violates "fundamental fairness," i.e., that it "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 352-53 (1990) (internal quotation marks and citations omitted); *see Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001), *cert. denied*, 535 U.S. 1031 (2002) (stating in reference to habeas corpus challenge to admission of other-acts evidence that "[s]tate court evidentiary rulings do not rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.") (internal quotation marks and citations omitted); *see also Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001) ("Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding.") (internal quotation marks and citation omitted).

### a. Reference To Threatening Of Witnesses

Burton asserts that the following exchange between the prosecutor and Markita Robinson on redirect examination was in error because the prosecutor elicited testimony suggesting that Robinson had been threatened:

Q.      What was the reason that you didn't contact the police before October 27th?
A.      'Cause I was scared.

Q.    Scared of what.
A.    Something happening to me.
Q.    For what reason.
A.    Threats. Through threats. I was just scared that something might happen to me and fear of my life.

J.A. at 31 (Br. in Support of Pet. for Habeas Corpus at 8) (quoting Trial Tr. Vol. III at 509-10). However, the prosecutor's line of questioning was in response to cross-examination by defense counsel suggesting that the witness had not contacted the police at the time of the events in question:

Q.    Now, prior to October 27th, you did not contact the police, is that correct?
A.    No.
Q.    And neither you nor your sister, as far as you know, contacted the police.
A.    No.

Trial Tr. Vol. III at 509. It does not appear that the prosecutor violated Michigan Rule of Evidence 404(b)(1), much less constitutional due process, because the prosecutor elicited the challenged testimony, not to prove Burton's character "in order to show action in conformity therewith," but rather to explore more fully the issue, first raised by defense counsel, as to why the witness did not report Burton's conduct to the police. Mich. R. Evid. 404(b)(1); *see Pennington v. Lazaroff*, No. 98-4373, 2001 WL 406420, **4 (6th Cir. Apr. 3, 2001) (stating that "if properly before the court, we could only conclude that the introduction of the prior misconduct did not violate 'fundamental fairness.' . . . The prior misconduct . . ., coupled with the evidence of [the defendant's] threats and the victims' fear and guilt, helped explain the victims' reasons for not exposing [the defendant's] transgressions. Hence, the evidence of other misconduct was more probative than prejudicial, and its admission did not violate the due process clause.").

Given the difficulties in establishing that the admission of evidence regarding possible threats against witnesses was fundamentally unfair in this case, an objectively reasonable lawyer could have chosen not to raise this issue on appeal. Because the substance of Burton's other-acts-evidence claim lacks merit, Burton has failed to show a reasonable probability that his conviction would have been reversed on direct appeal even if appellate counsel had raised the issue. Thus, Burton has not demonstrated that his counsel on direct appeal was constitutionally ineffective, and in turn has failed to establish the requisite cause for excusing his procedural default of this claim.

### b. Prosecutorial Use Of The Term "Safe House"

Burton also alleges that his counsel on direct appeal was constitutionally ineffective in failing to challenge the prosecutor's repeated reference to a residence linked to Burton as a "safe house" where firearms were kept. Burton contends that the prosecutor used the term "safe house" for the purpose of impermissibly characterizing Burton as a person with a propensity to commit illegal acts, citing as an example the prosecutor's statement during closing argument: "'Why do I keep a 9 mm in the safe house? These are all the acts, ladies and gentlemen, of a very innocent person, aren't they? It's all evidence on this record.'" J.A. at 32 (Br. in Support of Pet. for Habeas Corpus) (quoting Trial Tr. Vol. IV at 52).

Burton's contention that the prosecutor's references to a "safe house" where firearms were kept constituted inadmissble other-acts evidence is undermined by the fact that the prosecution seems to have intended to use such testimony to establish that Burton had access to a nine-millimeter handgun like the one used to kill the victim.[3]  Because the murder weapon itself does not appear to have been introduced in

---

[3]*See* Trial Tr. Vol. II at 402 (Test. of Jackie Robinson Harris) ("Q. All right. But this house on Lapeer Street, there were two twins there. A. Yeah, I only been there about two or three times. Q. You'd only been there two or three times. All right. What kind of house is that on Lapeer Street? What do you call that? Does it have a name? . . . Q. All right. What do they call 'em? Safe house? A. Yeah, that's where we kept our clothes. That where Dave kept his clothes I know —"); Trial Tr. Vol. II at 403-04

evidence at trial, evidence of Burton's connections to the West Lapeer residence and the presence at that location of the particular type of weapon used to kill McClayton did have probative value with respect to a material issue other than Burton's character. *See People v. VanderVliet*, 508 N.W.2d 114, 122, 126 (Mich. 1993) (noting that "[r]elevant other acts evidence does not violate Rule 404(b) unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith," and establishing that, for other-acts evidence to be admissible, "the prosecutor must offer the other acts evidence under something other than a character to conduct theory," "the evidence must be relevant under Rule 402, as enforced through Rule 104(b), to an issue or fact of consequence at trial," and "the danger of undue prejudice [must] substantially outweigh[] the probative value of the evidence") (internal quotation marks and citation omitted); *see also Waters v. Kassulke*, 916 F.2d 329, 336 (6th Cir. 1990) (finding that due process was not violated by the admission of other-acts evidence because the evidence was relevant to the case's central issues of knowledge and intent and the evidence's probative value outweighed its prejudicial effect).

Although the use of the term "safe house" might have been somewhat prejudicial, it cannot be said that the term was so prejudicial as to render Burton's trial fundamentally unfair. Moreover, the prosecutor's use of the term "safe house" without objection by Burton's trial counsel may have factored in the decision of Burton's counsel not to raise this issue on direct appeal. *See People v. Bullock*, 485 N.W.2d 866, 870 n.7 (Mich. 1992) (rejecting argument that trial court erred by admitting other-acts evidence because the defendant "failed to raise any timely objection at trial on the basis of MRE 404(b)"); *see also People v. Buck*, 496 N.W.2d 321, 330 (Mich. 1993) ("Appellate review of prosecutorial misconduct is foreclosed where the defendant fails to object or request a curative instruction, unless the misconduct was so egregious that no objection or curative instruction could have removed the prejudice to the defendant or if manifest injustice would result from our failure to review the claims of misconduct."). Hence, Burton's counsel on direct appeal was not constitutionally defective for failing to raise this claim, and there is not a reasonable probability that Burton's conviction would have been reversed on appeal. Because Burton has failed to demonstrate ineffective assistance of appellate counsel, this claim remains procedurally defaulted.

### 2. Testimony Regarding Burton's Incarceration

Burton's second procedurally defaulted claim is that his constitutional due process rights were violated when a witness for the prosecution stated on direct examination that he had been incarcerated with Burton. During the course of direct examination of Jackie Robinson Harris, the prosecutor asked Harris whether he had "received any threats from" Burton, to which Harris replied, "Well, I was in the bull pen with him over to the —." Trial Tr. Vol. II at 416 (Test. of Jackie Robinson Harris). Defense counsel raised an objection, the court held a bench conference, and the prosecutor then questioned Harris outside the presence of the jury. At the end of the questioning, the prosecutor and defense counsel determined that they did not wish to present any of the testimony elicited to the jury. Trial Tr. Vol. II at 416-19. Before the jury returned to the courtroom, the prosecutor made the following statement:

And just so the witness knows and the Court knows and Mr. Brehler [defense counsel] knows, I will be asking [Harris] about two felony convictions that he pled to that he's under

---

(Test. of Jackie Robinson Harris) ("Q. And, instead, Kumal came there. A. Yeah. . . . Q. Came to the house that you were at on Lapeer Street? A. Yes. Q. One of these safe houses? A. Yeah you could call it that. . . . A. It was, like, I never did run back into Kumal until I went over there one day — I was with Dave, and Dave, when he got something — I went up in there — that's all I heard. Q. Up in there, being at — A. Safe house. Q. — Lapeer? A. Yeah, see Dave — Q. Safe house on Lapeer."); Trial Tr. Vol. II at 408 (Test. of Jackie Robinson Harris) ("Q. . . . At or about that time, June the 3rd, did you ever see [Burton] in possession of a nine millimeter? A. No. Q. Do you know whether any nine millimeters were kept in the safe house? A. Yeah. Q. How many? A. There was only — there was only two of 'em that I saw. Q. Two nine millimeters that you saw in the safe house. A. Yes."); Trial Tr. Vol. II at 416 (Test. of Jackie Robinson Harris) ("Q. In June of 1994, did you ever see Kumal Burton with a nine millimeter? A. No. Q. And the nine millimeters that you were aware of in the safe house, do you know who those belonged to? A. No, I — I don't ask no — I didn't asked who they belonged to.").

sentence for. And they're both of the type that fall under the court rule, because they are in the court rule category.[4] And those are the only two that he has on his record.

Trial Tr. Vol. II at 419. Defense counsel entered no objection, and the prosecutor concluded his questioning by establishing Mr. Harris's convictions for felony larceny and attempted armed robbery. Trial Tr. Vol. II at 420.

In support of his claim, Burton cites *Estelle v. Williams*, 425 U.S. 501 (1976), in which the Supreme Court held that compelling prisoners to wear prison clothing during jury trials violated prisoners' due process rights because of the impact on defendants' presumption of innocence. However, the conduct in this case does not rise to the level of a due process violation as described in *Estelle*. First, the effect of Harris's passing use of the euphemism "bull pen" on Burton's presumption of innocence is considerably less than the negative impact of a defendant being dressed in prison attire throughout the entirety of his or her trial. Even assuming the jurors understood the meaning of the term "bull pen," any negative effect was mitigated by Harris's testimony being halted as soon as he used the term, and the court and counsel's repeated instructions to the jury regarding the prosecution's burden of proof and Burton's presumption of innocence. Furthermore, Harris's testimony did not refer specifically to Burton being previously convicted of a crime, and indeed probably related to Burton's confinement prior to conviction. *See* Black's Law Dictionary (8th ed. 2004) (defining "bullpen" as "1. An area in a prison where inmates are kept in close confinement. 2. A detention cell where prisoners are held until they are brought into court."). The record indicates that the jury would have been aware of Burton being held in police custody as a result of the testimony of Dennis Michael Shaw (to which defense counsel did not object) that Shaw "took custody" of Burton in Detroit. Tr. Trans. Vol. III at 542 (Test. of Dennis Michael Shaw). Jurors in a criminal case, even in the absence of a statement regarding the defendant's custodial detention during trial, are likely to presume that a criminal defendant, irrespective of his or her guilt or innocence, has spent at least some time in custody as a result of being charged with a crime, particularly one such as murder. Thus, it does not appear that the prosecution's eliciting of a passing reference to Burton's pre-trial incarceration impacted Burton's right to a presumption of innocence or was so fundamentally unfair as to require reversal of Burton's conviction. Because an objectively reasonable attorney could decide not to press this issue on appeal, and Burton has not shown a reasonable probability that his conviction would have been overturned if the issue had been raised, Burton has failed to demonstrate that his counsel on direct appeal was so constitutionally ineffective as to establish cause for excusing procedural default.

### 3. Jury Instruction Regarding Flight

Burton's third procedurally defaulted claim is that his counsel on direct appeal was constitutionally ineffective in failing to appeal the trial judge's instruction to the jury regarding flight:

> Now, there's been some evidence that this defendant tried to run away or tried to hide or did run away or did hide after these alleged events. And even after he was accused of this crime and in this case. Now, this evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake or fear. However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true. And if true, whether it shows that this defendant had a guilty state of mind.

---

[4] The prosecutor appears to be referring to the portion of Michigan Rule of Evidence 609 which permits the introduction of evidence that a witness has been convicted of a crime for the purpose of "attacking the credibility of a witness" if the crime contained an element of theft, the crime was punishable by imprisonment in excess of one year, and the court determines that the evidence has significant probative value on the issue of credibility that outweighs its prejudicial effect. *See* Mich. R. Evid. 609(a)(2).

Trial Tr. Vol IV. at 58.[5]  Because the jury instruction directed jurors to make their own determinations as to whether Burton did in fact flee and if so, what state of mind such flight evinced, the trial judge's instruction regarding flight was not so prejudicial as to render the entire trial fundamentally unfair.  *See Mitzel v. Tate*, 267 F.3d 524, 536 (6th Cir. 2001), *cert. denied*, 535 U.S. 966 (2002) ("[T]o warrant habeas relief [i.e., to state a constitutional due process claim] because of incorrect jury instructions, Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair. Allegations of 'trial error' raised in challenges to jury instructions are also reviewed under *Brecht's* harmless error standard.") (internal quotation marks and citations omitted).  Moreover, the trial judge's decision to include an instruction regarding flight does seem to be based on evidence adduced at trial.  Trial Tr. Vol. II at 413-14 (Test. of Jackie Robinson Harris) (noting Burton's statement that he planned to leave Lansing after a television news report identified Burton as a suspect in McClayton's murder).  Thus, Burton's counsel on appeal could have reasoned that this argument lacked merit, and Burton has failed to show a reasonable probability that his conviction would have been reversed if this argument had been raised on direct appeal.  As a result, Burton has not demonstrated constitutionally ineffective assistance of appellate counsel as cause to excuse procedural default.

### 4.  Jury Instruction Omitting Element Of Murder

Burton's fourth procedurally defaulted claim is that his conviction should be reversed on the basis that the trial judge omitted an element of the crime of murder in his instructions to the jury.  Specifically, Burton challenges the omission of an instruction that, in order to prove that Burton committed murder, the prosecution must show beyond a reasonable doubt the absence of justification or excuse.  *See Gall v. Parker*, 231 F.3d 265, 287 n.4 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2001) (noting the complexity of cases where "an ingredient can arguably be both an element of a charged crime and of a defense, or the presence of a defense can arguably negate a required element").

Michigan case law at the time of Burton's trial did list absence of mitigation or justification as one of the elements of murder.  *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996) ("The elements of second-degree, or common-law, murder are '. . . (3) absent circumstances of justification, excuse, or mitigation. . . .'") (quoting *People v. Dykhouse*, 345 N.W.2d 150, 158 (Mich. 1984)).  However, the Michigan Supreme Court had also stated that "[t]he absence of mitigating circumstances need not be established in order to convict one of first- or second-degree murder" in ruling that voluntary manslaughter (which required a showing of provocation) was not automatically a lesser included offense of murder.[6] *People v. Van Wyck*, 262 N.W.2d 638, 640 (Mich. 1978); *see also Berrier v. Egeler*, 583 F.2d 515, 521 (6th Cir.), *cert. denied*, 439 U.S. 955 (1978) (ruling that failure to include in jury instruction that burden of proof is upon the prosecution to disprove self-defense theory asserted by defendant violated defendant's federal due process rights, explaining that, "[i]n Michigan an element of proof of murder is evidence which negates self-defense, *in any case where self-defense is claimed and evidence is offered thereon*") (emphasis added).  Indeed, the Michigan pattern jury instructions for first-degree and second-degree murder at the time of Burton's trial specifically noted that an instruction regarding the element of absence of justification or mitigation was not required if no such evidence had been proffered during trial.  *See 2 Mich. Crim. Jury Instructions 16.1 First-degree Premeditated Murder n.4 & Commentary (2d ed. 2003 & 2003/2004 Supp.)*

---

[5]This instruction is substantively identical to the Michigan pattern jury instruction regarding flight. *See* 1 Mich. Crim. Jury Instructions 4.4 Flight, Concealment, Escape or Attempted Escape (2d ed. 2003 & 2003/2004 Supp.) ("(1) There has been some evidence that the defendant [tried to run away / tried to hide / ran away / hid] after [the alleged crime / (he / she) was accused of the crime / the police arrested (him / her) / the police tried to arrest (him / her)]. (2) This evidence does not prove guilt. A person may run or hide for innocent reasons, such as panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt. (3) You must decide whether the evidence is true, and, if true, whether it shows that the defendant had a guilty state of mind.").

[6]*Van Wyck*'s ruling that manslaughter is not a lesser included offense of murder was only recently overruled by the Michigan Supreme Court in *People v. Mendoza*, 664 N.W.2d 685, 696 (Mich. 2003).

("Paragraph (6) [i.e., 'that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime'] may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter. . . . Using traditional state of mind formulations based on 'malice aforethought,' some cases had implied that justification, excuse, and mitigation were 'negative elements' of murder, which the prosecutor had to disprove. However, the weight of Michigan authority is that justification, excuse, and mitigation need not be disproved by the prosecutor in every case. The absence of mitigating circumstances need not be established in order to convict one of first- or second-degree murder. With this in mind, the committee bracketed paragraphs on justification, excuse, and mitigation for use in appropriate cases. Of course, when a defense of self-defense, accident, or provocation is raised by the evidence, the prosecutor is required to disprove the defense beyond a reasonable doubt and the trial court is obliged to give the appropriate bracketed language.") (internal quotation marks and citations omitted); 2 Mich. Crim. Jury Instructions 16.5 Second-degree Murder n.4 (2d ed. 2003 & 2003/2004 Supp.); 2 Mich. Crim. Jury Instructions 16.6 Element Chart — First-degree Premeditated and Second-degree Murder n.* (2d ed. 2003, 1995/1996 Supp., & 2003/2004 Supp.).

Burton's principal defense at trial was that he had been mistakenly identified as the person who shot McClayton. Because Burton claimed not to have shot McClayton, the issue of justification or mitigation simply did not apply, and an instruction on these issues was not required under Michigan law. Trial Tr. Vol. IV at 39, 44-45. Furthermore, because justification or mitigation do not seem to have been at issue during the trial, any jury-instruction error on this point did not render Burton's trial so fundamentally unfair as to state a constitutional due process claim cognizable on habeas corpus review. In sum, a constitutional claim based on the absence of an instruction regarding mitigation or justification in this case lacks merit, so it cannot be said that failure to raise such an objection on appeal constituted ineffective assistance of appellate counsel that overcomes procedural default.

### 5. Prosecutorial Statements Regarding Jury's Duty To Convict And Defense Counsel's Failure To State That Defendant Is Not Guilty

Burton's fifth procedurally defaulted claim is that the prosecutor engaged in misconduct by making statements undermining Burton's presumption of innocence. Prosecutorial misconduct, in order to rise to the level of a constitutional due process violation, must be so severe that the defendant did not have a fair trial. As we explained in *Bowling v. Parker*, for prosecutorial misconduct to rise to the level of a constitutional violation cognizable on habeas review:

> the misconduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial.

344 F.3d 487, 512-13 (6th Cir. 2003) (internal quotation marks and citations omitted).

### a. Duty To Convict

Burton first challenges statements of the prosecutor during voir dire on the basis that such statements impermissibly instructed jurors that they had a duty to convict Burton; that is, that the prosecutor, in effect, directed the jury to enter a verdict against Burton. However, a review of the prosecutor's statements reveals that they were not improper because they did not amount to an instruction to the jury that it must convict Burton irrespective of its own assessment of the evidence presented during trial. Rather, the prosecutor's statements were part of a line of questioning directed at determining whether jurors understood that, if the

*jurors* determined that the prosecution had proven beyond a reasonable doubt that Burton had committed murder, then they would be under a duty to convict Burton:

> [D]o you understand at the conclusion of the case, if the evidence shows that the defendant is guilty of the crime of murder, it'd be your duty as jurors to come back with a guilty verdict. Do you understand that? . . .
>
> If the proofs show you beyond a reasonable doubt that this man, Kumal Burton, committed murder, it'd be your duty to convict him. Do you understand that? If the evidence was there. It's the way our system works.
>
> If the evidence shows beyond a reasonable doubt that Kumal Burton committed murder on June 3rd, 1994, would each of you be able to stand up in this courtroom and face him and tell him that you are convicting him of murder?

Trial Tr. Vol. I at 28. Such questioning is not improper during the impaneling of a jury. *See United States v. Hill*, 738 F.2d 152, 154 (6th Cir. 1984) ("Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.'") (quoting *Hayes v. Missouri*, 120 U.S. 68, 70 (1887)); *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) ("The primary purpose of the voir dire of jurors is to make possible the empanelling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel. It follows, then, that a requested question should be asked if an anticipated response would afford the basis for a challenge for cause.") (citations omitted). Moreover, the prosecutor specifically noted during voir dire that the jury would have a duty to find Burton not guilty if the prosecution failed to meet its burden of proof. Trial Tr. Vol. I at 49-50 ("And obviously, as [defense counsel] has indicated here, if the People don't prove guilty beyond a reasonable doubt on all the elements, it would be your duty as jurors to find the defendant not guilty. Do you understand that?"). Given that Burton's claim of unconstitutional prosecutorial misconduct based on the prosecutor's alleged statement that the jury had a duty to convict Burton lacks merit, Burton's counsel on direct appeal was reasonable in choosing not to raise this argument on direct appeal, and no showing of ineffective assistance of appellate counsel can be made. Thus, this claim remains procedurally defaulted.

### b. Prosecutorial Comments On Defense Counsel's Failure To State That Defendant Is Not Guilty

Burton's second allegation of prosecutorial misconduct stems from the prosecutor's statement during closing argument that, "I did not hear [defense counsel] say that his client was not guilty. He did not say that." Trial Tr. Vol. IV at 30 (quoted in J.A. at 68) (Br. in Support of Pet. for Habeas Corpus at 45). Burton asserts that such a comment constitutes prosecutorial misconduct because it runs counter to the presumption of innocence and the prosecution's burden to prove its case beyond a reasonable doubt.

While the prosecutor's statement was improper, it did not render Burton's trial so fundamentally unfair that a constitutional violation mandating reversal of conviction occurred. The prosecutor, defense counsel, and the court repeatedly noted Burton's presumption of innocence. Trial Tr. Vol. I at 49 (during voir dire, prosecutor's statement that, "because the state of Michigan — I represent the state of Michigan — the People of the state of Michigan, the burden, as [defense counsel] has suggested, is on my shoulders to prove guilt in this courtroom. And I accept that burden. That's the burden that the law imposes. But that doesn't mean that I have to come into the courtroom on criminal cases and prove guilt beyond all doubt. . . . And obviously, as [defense counsel] has indicated here, if the People don't prove guilty beyond a reasonable doubt on all the elements, it would be your duty as jurors to find the defendant not guilty."); Trial Tr. Vol. I at 81 (judge's charge to jury at opening of trial regarding presumption of innocence); Trial Tr. Vol. I at 109 (defense counsel's statement during opening remarks to the jury that, "[A]s we talked earlier during the

voir dire, the burden is on the prosecutor throughout this trial to prove his allegations beyond a reasonable doubt. And that burden does not shift at any point in time to the defendant. And so as we discussed during the voir dire, since that's true, the burden never shifts — the defendant has no obligation and need not present any witnesses. Need not even take the stand and testify. Because throughout this process, until such time as the Judge gives you the instructions and sends you into that room to deliberate over what you heard, the defendant is cloaked with a presumption of innocence and the burden to change that presumption of innocence, remains firmly upon the prosecutor's shoulders. . . . And that's very important today, because I will tell you right now, Kumal Burton is not going to take the witness stand. And, in fact, we will present no witnesses."); Trial Tr. Vol. IV at 54 (judge's instruction to jury at close of trial that, "a person accused of a crime is presumed to be innocent. This means that you must start with the presumption that this defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.").

In view of the repeated references to the presumption of Burton's innocence during the course of the trial, it cannot be said that the prosecutor's single (albeit improper) remark during closing arguments rendered Burton's trial as a whole fundamentally unfair. *See Roe v. Baker*, 316 F.3d 557, 566 (6th Cir. 2002), *cert. denied*, 124 S. Ct. 140 (2003) ("[T]he government does not argue that such comments were appropriate, but they were limited, isolated and mitigated when the court gave the jury appropriate instructions, which would have cured any misperception that the jury might have received from the prosecutor's arguments. We agree. Moreover, such passing comments did not render the sentencing phase fundamentally unfair."); *see also Gravley v. Mills*, 87 F.3d 779, 789 (6th Cir. 1996) (explaining that, with regard to prosecutorial comments regarding a defendant's post-arrest silence, a habeas petitioner "must establish that the error had a 'substantial and injurious effect or influence in determining the jury's verdict'") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Because establishing a claim for unconstitutional prosecutorial misconduct on the facts of the case at bar is difficult at best, counsel on direct appeal could have reasonably decided not to raise this claim. Hence, the failure of Burton's counsel to raise this objection on direct appeal does not rise to the level of constitutionally ineffective assistance of appellate counsel necessary to establish cause to excuse procedural default.

In sum, the failure of Burton's counsel on direct appeal to raise Burton's various procedurally defaulted claims does not rise to the level of constitutionally ineffective assistance of counsel necessary to overcome procedural default because none of Burton's claims seem meritorious. Because Burton is unable to prove cause via ineffective assistance of appellate counsel, an analysis of the prejudice prong of the "cause and prejudice" inquiry is not required. Thus, we conclude that the district court did not err in denying Burton's petition for a writ of habeas corpus with respect to the procedurally defaulted claims.[7]

### III. CONCLUSION

Burton has failed to establish that the Michigan courts' denial of his claim of right to counsel of choice was contrary to or an unreasonable application of clearly established federal law. Burton also has not shown that his counsel on direct appeal was so constitutionally ineffective as to establish the cause and prejudice necessary to permit a federal court to review claims procedurally defaulted at the state level. Consequently, we **AFFIRM** the district court's denial of Burton's petition for a writ of habeas corpus.

---

[7]Because we have concluded, in determining that Burton's counsel on direct appeal was not constitutionally ineffective, that all of the claims he asserts on habeas review lack merit, we see no basis upon which a writ of habeas corpus can issue. Thus, we need not address Burton's argument that the district court erred in finding that all but one of his claims had been procedurally defaulted.