RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JAMES TRIMBLE,

      *Petitioner-Appellee/Cross-Appellant,*

    *v.*

DAVID BOBBY, Warden,

      *Respondent-Appellant/Cross-Appellee.*

Nos. 13-3381/3455

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:10-cv-00149—James S. Gwin, District Judge.

Argued: December 3, 2014

Decided and Filed: October 22, 2015

Before: SILER, BATCHELDER, and CLAY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Joseph E. Wilhelm, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Thomas E. Madden, Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Joseph E. Wilhelm, Alan C. Rossman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Kathryn L. Sandford, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellee/Cross-Appellant.

     BATCHELDER, J., delivered the opinion of the court in which SILER, J., joined, and CLAY, J., joined in part. CLAY, J. (pp. 20–30), delivered a separate opinion concurring in part and dissenting in part.

1

—————————————

**OPINION**

—————————————

ALICE M. BATCHELDER, Circuit Judge. In 2005, James Earl Trimble shot and killed his then-girlfriend and her seven-year-old son with an assault rifle. Later that same night, he broke into the apartment of a female college student, held her hostage, and eventually killed her with a handgun. Overwhelming evidence established Trimble's guilt, including his admissions of guilt to two family members and the police, significant forensic evidence tying him to the murders, and eyewitness testimony. A jury convicted him of the three murders and the trial judge, upon the jury's recommendation, imposed three death sentences. The district court conditionally granted Trimble habeas relief because it determined that an alternate juror who was later empaneled during the penalty phase of Trimble's trial could not set aside his personal views on the death penalty and apply the law. Because we conclude that the alternate juror was not an automatic-death-penalty juror, and that Trimble's other claims are meritless, we REVERSE the district court's granting of the writ on the juror bias claim and AFFIRM the district court's denial of habeas relief on Trimble's claims of prejudicial admission of weapons and prosecutorial misconduct.

**I.**

On January 21, 2005, James Earl Trimble shot and killed his live-in girlfriend, Renee Bauer, and her seven-year-old son, Dakota Bauer, with an AR-15 assault rifle. Trimble shot Renee once in the head and eleven times in the back and the hand, and Dakota six times in the head, neck, and torso. Soon after the shootings, Trimble's mother called him at the house he had shared with the two victims, and he confessed to the killings. Trimble's mother called Trimble's brother and asked him to contact Trimble. Trimble again confessed to killing Renee and Dakota, this time to his brother. Upon hearing this information, Trimble's brother told Trimble to remain in the house while he called the police.

Unfortunately, Trimble did not heed his brother's advice. He left his home on foot and ended up at a nearby residence, where he held two occupants of the home at gunpoint for a few

minutes, but eventually let them go unharmed. Leaving this house, he ran through the nearby woods, randomly stumbling upon the apartment of Sarah Positano, a twenty-two-year-old college student, whom he then took hostage.

Positano called 9-1-1 at 11:18 PM, presumably at Trimble's request, in order to relay his demands to the police; she reported that Trimble had entered her home and would shoot her if police attempted to raid the apartment. She told the operator that Trimble had a "9-mm pistol with no safety." Trimble took the phone from Positano and declared, "I have got the hammer held back and the trigger pulled. So if the cops shoot me or even attempt to break in here, I will let go of the trigger and the innocent girl will die." During the call, Positano asked Trimble, "could you not put the gun to my head?"

Meanwhile, police established a perimeter around Positano's apartment and reconnected with Trimble on the phone through hostage negotiators, talking with Trimble about various topics. The last call culminated in Trimble's telling Positano that she would be going home if the cops did not "come up here." A few seconds later, Positano—with whom another negotiator had maintained phone contact—screamed "I've been shot" and started to gasp for breath. Shortly thereafter, around midnight, the authorities lost the phone connection. Apparently, the hostage negotiator did not hear the shouting or gasping for breath, because throughout the night the police continued to believe that Positano was alive. The next morning, however, the SWAT team raided the apartment, found Positano's body, and arrested Trimble.

After being transported to jail, Trimble waived his *Miranda* rights and confessed to the three murders. Although he claimed that he did not remember killing Renee and Dakota Bauer, he admitted that he must have because "no one else was there." He later asserted that because of a combination of sleep deprivation and drug addiction, he simply had lost control of himself. Trimble contended that he had not intended to kill Positano, but that the gun accidentally discharged when the police entered the apartment, startling him. Overwhelming evidence at trial, however, indicated that the police had entered the apartment only once, when the SWAT team found Positano's body and arrested Trimble. Police found the AR-15 assault rifle and a Sig Sauer 9-mm handgun at the Bauer and Positano residences, respectively. Police matched casings

at the crime scenes to these two weapons. Trimble does not dispute that the apparent murder weapons belonged to him.

A grand jury indicted Trimble on three counts of aggravated murder, all with death specifications, as well as three counts of kidnapping, two counts of felonious assault, and one count of aggravated battery with firearm specifications. Trimble pleaded not guilty. At trial, the state presented extensive evidence of Trimble's guilt, including the aforementioned confessions, forensic evidence, and eyewitness testimony. Trimble's defense focused on why the killings occurred and suggested decreased culpability. The jury found Trimble guilty on all charges.

After the finding of guilt, the case proceeded to the penalty phase. In mitigation, Trimble introduced evidence that he suffered from bipolar disorder and drug and alcohol addiction, that he was a good and dependable worker, that he gave assistance to elderly members of his church and his mother, and that he was remorseful. The state provided several aggravating factors: that he murdered his victims as part of a course of conduct involving the purposeful killing of two or more people, that he killed a child under the age of thirteen, and that he murdered Positano while committing the offenses of kidnapping and aggravated burglary. Ultimately, the jury recommended death sentences for each of the killings, which the trial court imposed.

Trimble timely appealed. The Ohio Supreme Court denied relief on all grounds and affirmed Trimble's death sentences. *State v. Trimble*, 911 N.E.2d 242 (Ohio 2009). The United States Supreme Court denied certiorari. *Trimble v. Ohio*, 558 U.S. 1055 (2009). Trimble also sought post-conviction relief, which the trial court denied. The Ohio Court of Appeals affirmed, *State v. Trimble*, 2008-Ohio-6409, 2008 WL 5147441 (Ohio Ct. App. Dec. 5, 2008), and the Ohio Supreme Court denied review, *State v. Trimble*, 912 N.E.2d 107 (Ohio 2009) (table).

In 2010, Trimble filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He raised six grounds for relief, only three of which are relevant for this appeal. First, he claimed that the court's empaneling of a particular juror violated his right to a fair and impartial jury guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution. Second, he claimed that the court's admission and display of firearms not used in the killings violated his Fourteenth Amendment due process rights. Third, he claimed that prosecutorial misconduct denied him a fair and reliable sentencing hearing in violation of his Fourteenth

Amendment rights. The district court granted Trimble's petition as to his juror-bias claim and denied relief on all remaining grounds. The court certified an appeal on the juror-bias claim, the admission-of-weapons claim, and the prosecutorial-misconduct claim. The Warden appeals the district court's grant of habeas relief on the juror-bias claim, while Trimble cross-appeals the district court's denial of habeas relief on the other two claims.

**II.**

We review de novo a district court's legal conclusions and mixed questions of law and fact, and review its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court reaches a decision different from that of the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Id.* For factual matters, a district court may not grant a habeas petition unless the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). This standard, the Supreme Court recently reminded this circuit, is "difficult to meet." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)) (internal quotation marks omitted).

**III.**

The district court granted Trimble habeas relief because it determined that a particular juror was an "automatic death penalty juror." The Warden contends that Trimble procedurally defaulted this claim or, in the alternative, the district court erred in its AEDPA analysis.

**A.**

During *voir dire*, the trial judge and counsel for both sides asked the juror in question, Juror 139, many questions about his views on the death penalty and the role of a juror. To start, Juror 139 affirmed to the trial judge that his views on the death penalty would not substantially impair his ability as a juror to perform his duty and that he could consider the evidence on the aggravating circumstances and mitigating factors. The prosecutor began his questioning of the juror by explaining the dual-phase capital sentencing structure in Ohio. Juror 139 affirmed that he understood how the process worked. Then, the following exchange took place:

> Q. In other words, what I'm asking you, do you believe that just because you found him guilty in the trial stage that he's automatically now subject to the death penalty?
>
> A. If I find him guilty?
>
> Q. At the trial stage do you now believe he's automatically subjected to the death penalty?
>
> A. Yeah.
>
> Q. You do?
>
> A. If he killed three people he should.
>
> Q. Do you understand in Ohio the law is that you don't make that decision at that time, do you understand that?
>
> A. How is it? Yeah, I understand.

The prosecutor then asked Juror 139 about his personal opinion on the death penalty. The juror said that he thought "the penalty should be there" because "if you take a life why should you be allowed to live?" The prosecutor explained to him that "in Ohio, again the law is that if you take a life you may be allowed to live" and explained the sentencing phase again. Juror 139 then answered "yeah" to several questions from the prosecutor as to whether he would follow the judge's instructions on sentencing and whether he could vote for the death penalty.

The defense began its cross-examination of Juror 139 by following up on his personal views of the death penalty. Juror 139 noted that he had "never really thought about" his views on the death penalty because this "is the first time" he had ever been called to speak about them. He then volunteered that "if you're guilty, without a reasonable doubt, then if you take somebody's life your life should go — you shouldn't be allowed to live either." Further questioning by the defense on this point elicited the following exchange:

> Q. And that is one of the things that I — I made a note of that you felt that, if you take a person's life you shouldn't be able to live.
>
> A. An eye for an eye, all that.
>
> Q. That is your feeling?
>
> A. Yeah.
>
> Q. That is how you look at your position as a juror in this particular case?
>
> A. Yeah. What goes around comes around.
>
> Q. So if you were seated as a juror in this particular case you would come into this whole process with that mind set, that is what you believe regarding the death penalty?
>
> A. If he's guilty.

After counsel for the defendant again detailed the two-step sentencing structure for Juror 139, the following exchange took place:

> Q. After you have made that determination in the first stage, then you move to the second stage, you understand that?
>
> A. Right. We found him guilty, now we go to the second, see which sentence he gets.
>
> Q. Right.
>
> A. If he knew what he was doing at the time, had a clear head, knew exactly, planned out, then he should get the death penalty. But if he was under the influence or something, or not quite right in the head, if you can prove that, then maybe it shouldn't be so harsh. Either way is bad but then you get the prison time.

Finally, the prosecutor and defense counsel stopped asking questions and the trial judge asked a few questions just to "make sure":

Q. You're just about done.  I just want to make sure.  They have asked you a lot of long questions, hard to follow.  Can you follow my instructions at the sentencing phase?

A. You mean –

Q. Whatever the Court would tell you the law is, can you follow the law if the Court would tell you what the law is, can you follow that?

A. Yeah.

Q. Okay.

A. Whatever the law is, yeah.

At this point, the trial judge released Juror 139 from the courtroom.

Defense counsel immediately objected to Juror 139 as an automatic death penalty juror. The court overruled defense counsel's objection, finding that "the juror indicated a willingness to follow the Court's instructions to the law as provided," and that "the juror indicated he will consider and weigh the factors in mitigation [and] require the State to prove beyond a reasonable doubt the aggravating circumstances."

Each side had six peremptory challenges for the jury empaneling.  The defense used five of its six peremptory strikes, but passed on using the sixth.  After the jury was seated, the trial judge agreed to empanel four alternate jurors and gave each side two peremptory strikes for the alternate jurors.  The defense used its two peremptory strikes for alternate jurors on two other jurors, causing Juror 139 to be substituted as the first alternate.

The jury as empaneled sat during the guilt phase and found Trimble guilty of the three murders.  During the penalty phase, one of the twelve jurors became ill and was excused by the trial judge.  Juror 139, as first alternate, replaced the ill juror as part of the jury for the penalty phase.  The penalty phase jury subsequently recommended death sentences for the three murders.

On direct appeal to the Ohio Supreme Court, Trimble argued that the trial court's failure to excuse for cause jurors who would automatically vote for the death penalty denied him his right to a fair trial and due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution.  The Ohio Supreme Court noted that Trimble had "waived any objection to these overruled challenges because of his failure to exhaust his peremptory challenges." *Trimble*, 911 N.E.2d at 259.  It then conducted a plain-error analysis of each of

Trimble's challenges, including the challenge to Juror 139. The court held that although Juror 139 "believed in the death penalty as an 'eye for an eye' and would have that mindset if the defendant was found guilty," he had "assured the court that he could listen to the evidence, follow the court's instructions, and vote for a life sentence if the state failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors." *Id.* These responses "showed that he would not automatically vote for death." *Id.*

**B.**

The Warden contends that Trimble procedurally defaulted his claim about Juror 139 because the Ohio Supreme Court enforced against Trimble its procedural rule that defendants must exhaust all peremptory challenges, and if they failed to do so any objection to a failure to excuse a juror for cause is waived. The procedural rule is encapsulated in *State v. Getsy*, 702 N.E.2d 866, 880 (Ohio 1998): "[E]rror in the denial of a challenge of a juror for cause cannot be grounds for reversal when the defendant did not exhaust his peremptory challenges."

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (quoting *Beard*, 558 U.S. at 60). Although "ordinarily, violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim," there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002). Notably, in *Lee* one of the factors the Court found relevant to its determination that the factual situation at issue was such an "exceptional case" was that "no published Missouri decision directs flawless compliance with [the procedural rule] in the unique circumstances this case presents . . . ." *Id.* at 382.

The underlying rule—that error in the denial of a challenge of a juror for cause cannot be grounds for reversal when the defendant did not exhaust his peremptory challenges—is certainly firmly established and regularly followed in Ohio. *See, e.g., State v. Jones*, 744 N.E.2d 1163,

1172 (Ohio 2001); *State v. Stallings*, 731 N.E.2d 159, 170 (Ohio 2000); *State v. Poindexter*, 520 N.E.2d 568, 572 (Ohio 1998). This rule, however, is almost always applied in the context of a challenge to a regular juror after the defendant failed to use all of his peremptory strikes during *voir dire*. In those cases, the rule bars an appellate or collateral challenge to the juror because the defendant could have used his outstanding peremptory strike to remove that juror at trial. In Trimble's case, however, the factual situation is different. Although Trimble failed to exhaust his peremptory challenges for the regular jurors, he is not challenging the empanelling of a regular juror. Rather, he is challenging the empanelling of an alternate juror after a regular juror was excused, and he did, in fact, exhaust his peremptory challenges for the alternate jurors.

As far as we can tell, this precise factual situation has arisen in only two Ohio cases. Of those two, however, the Ohio courts applied the rule in only one, and that case was unpublished. *Compare State v. Wright*, No. 00CA39, 2001 WL 1627643, at *19 (Ohio Ct. App. Dec. 6, 2001) (applying the rule), *with State v. Roberts*, 850 N.E.2d 1168, 1182 (Ohio 2006) (reaching the merits of the claim without discussing procedural default). Even if the rule had been applied in both cases, however, it would not be "firmly established and regularly followed" in this particular context. *See Lee*, 534 U.S. at 382 ("'[A]lthough [the rules themselves] may not [have been] novel, . . . [their] application to the facts here was.'" (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 245 (1969) (Harlan, J., dissenting))). *Lee* counsels that we should decline to defer to the state's application of its procedural default rule in this particular context. *See id.*; *Post v. Bradshaw*, 621 F.3d 406, 423 (6th Cir. 2010) ("[W]hen a state erroneously relies upon its own rule of procedural default, the claim is not barred.").

We note that our decision not to defer to the Ohio Supreme Court's application of its procedural rule in this case creates some uncertainty as to the appropriate standard of review given the seemingly inconsistent cases from this circuit on the topic of plain-error review and AEDPA deference. Along with its declaration of the procedural rule, the Ohio Supreme Court conducted a plain-error analysis of the juror-bias claim. The Warden submits that in *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009), a panel of this court held that when a federal court decides that a state court improperly invoked a procedural default, AEDPA deference still applies to any underlying plain-error analysis of the claim because "[t]he state court's

substantive reasoning does not simply vanish along with its erroneous procedural-default determination. Nor does AEDPA." As Trimble highlights, however, in a recent decision a panel of this court noted in a footnote that "[w]e have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference." *Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014). Where a state court has not adjudicated a claim on the merits, the issue is reviewed de novo by a federal court on collateral review. *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004). On the surface, at least, the approaches of *Fleming* and *Frazier* are in direct conflict. *See Frazier*, 770 F.3d at 506 (Sutton, J., concurring in the judgment) ("We have been down this road before, and [*Fleming*] tells us how to navigate it.").

We need not enter this debate, however, because we hold that under either standard of review, AEDPA deference or de novo, Juror 139 was not an automatic death penalty juror. Because he had been rehabilitated by the trial judge, the court committed no constitutional error in allowing him to sit on the penalty phase jury. Because the de novo standard is less deferential, we will analyze this claim under that standard.

## C.

In a death penalty case, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980). However, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.* "The impaneling of a biased juror warrants a new trial" because "[t]he presence of a biased juror cannot be harmless." *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (internal quotation marks omitted).

Even without AEDPA, which would provide the Ohio Supreme Court's adjudication with an extra layer of deference, this juror-bias claim must still pierce the "special deference" accorded to a trial court's determination on a given juror's impartiality. *See White v. Mitchell*, 431 F.3d 517, 538 (6th Cir. 2005) (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)); *see*

*also Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (noting that juror-bias determinations are "entitled to deference even on direct review"). A federal court can overturn a trial judge's finding of juror impartiality only where manifest error is shown. *Patton*, 467 U.S. at 1031. "[O]ur review is deferential, respecting the trial judge's proximity to the venire and the determinations of credibility and demeanor that *voir dire* involves." *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir. 2000). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386–87 (2010). Further, we must keep in mind that "it is not uncommon for jurors to express themselves in contradictory and ambiguous ways, both due to unfamiliarity with courtroom proceedings and cross-examination tactics and because the jury pool runs the spectrum in terms of education and experience." *White*, 431 F.3d at 537.

Two of our cases serve as bookends to our analysis of this claim. On the one hand, in *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004), we held that a challenged juror was not an automatic death penalty juror. Although that juror "did not stake a firm 'pro-death penalty' stance," she eventually declared that her "bottom line" was that she would "vote for the death penalty because there's eligibility for parole." *Id.* at 958 (internal quotation marks omitted). The juror, however, later indicated "that she could set aside her personal beliefs concerning parole and follow the court's instructions" and that the sentencing options would "start out equally" in her mind. *Id.* (internal quotation marks omitted). We held that the juror would not automatically apply the death penalty in every case because she "evinced a lack of bloodthirst, professed a dislike for all the sentencing options, and attested to her ability to follow the court's instructions despite her aversion to parole." *Id.* at 959.

On the other hand, in *White*, 431 F.3d at 541, we held that a challenged juror was an automatic death penalty juror. The juror in that case made cursory statements that she could follow the law while also stating "repeatedly that she had doubts as to whether she could follow the law," and that "she did not think it would be fair to the defendant for her to sit on the jury." *Id.* We highlighted three particularly troubling elements of her *voir dire*: 1) that she had already

decided what punishment was appropriate; 2) that she "relished taking part in the imposition of the death penalty in this particular case"; and 3) that she "believed that her anticipated outcome of the case was the true and honest one, thus reflecting an inherent bias." *Id.* We held that the juror would automatically apply the death penalty in this case because "[t]hese statements not only indicate that [the juror] had a strong inclination toward imposing the death penalty, they also indicate that she was looking forward to participating in the imposition of this particular defendant's sentence." *Id.*

Occupying the vast space between *Williams* and *White* is *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003). In that case, we held that a juror with marked similarities to Juror 139 was not an automatic death penalty juror. That juror "did initially state that he would automatically give the death penalty to those who met the aggravating factor, but later he expressly said that he would consider mitigating evidence." *Id.* at 520. Because the trial court asked him "thorough questions, and [his] responses showed that he was not someone who would automatically impose the death penalty in all cases" when he affirmed that he would consider mitigating evidence, we held that he was not "an 'automatic death penalty' juror within the meaning of *Morgan*." *Id.* at 520. Although this was an AEDPA case, we relied on AEDPA deference only in the alternative. *Id.* Our holding rested primarily on the fact that "given the deference we give to trial courts' determinations of impartiality," there was "no constitutional error" in allowing the challenged juror to sit on the penalty-phase jury. *Id.*

Trimble argues that our case is not *Williams*. True, but it is also not *White*. Juror 139 never expressed doubts as to whether he could follow the law and never stated that it would be unfair to Trimble for him to sit on the jury. Although he personally believed in the death penalty in the abstract, there is no indication that he had already decided that the death penalty was appropriate in this particular case. Juror 139 was not relishing his participation in the imposition of Trimble's death sentence because of some personal animosity toward Trimble. Unlike the juror in *White*, Juror 139 specifically said that he knew very little about Trimble's case. *White* is a particularly egregious situation in which an individual desired to participate on a jury because she wanted to provide one of the twelve votes for death against a particular defendant. It evinces a true example of what *Morgan* forbids: a juror who would apply the death penalty in *every* case.

Juror 139 is not such a juror. *Compare Morgan*, 504 U.S. at 729 (precluding from service a juror who "will automatically vote for the death penalty *in every case*" (emphasis added)), *with* Dist. Ct. Op. 40 ("Upon a finding of guilt, [Juror 139] would, *in almost all circumstances*, vote for execution." (emphasis added)).

Instead, what we have here is a juror who was obviously very confused about the dual-phase capital sentencing structure in Ohio. While he did initially state that he would automatically apply the death penalty, *Bowling* shows that such a statement by itself is not determinative of his suitability to serve on the jury. Juror 139 also seemed to conflate his own personal views of the death penalty with his service as a juror. But the end of the colloquy is telling. Juror 139 stated that "[i]f [the defendant] knew what he was doing at the time, had a clear head, knew exactly, planned out, then he should get the death penalty," but if he was "under the influence or something, or not quite right in the head, if you can prove that, then maybe it shouldn't be so harsh." This statement is inartful, but captures a rudimentary understanding of the penalty phase, including the role of mitigating evidence. *Cf. Bowling*, 344 F.3d at 520 ("I feel that when a man takes another life, he should be punished for that. But, if he takes someone's life and he is not in his right mind, then I would consider . . . the other options."). We do not require jurors to express themselves as if they were trained attorneys.

While our own evaluation of the record is relevant, more relevant is the trial court's determination that Juror 139 was rehabilitated. We will overturn this determination only if "the cold record alone is so extensive and so persuasive that it outweighs our presumptive deference." *See Franklin v. Anderson*, 434 F.3d 412, 427 (6th Cir. 2006). Here, the record contains confused statements about the dual-phase structure and declarations of personal beliefs about the death penalty coupled with affirmances of ability to follow the law and consider the evidence, and a final statement that shows a rough understanding of the process, or at the very least undermines the claim that Juror 139 would automatically vote for the death penalty in every case. When compared to the particularly egregious situation in *White* and the strikingly similar situation in *Bowling*, these facts are not so extensive and persuasive as to outweigh our presumptive deference to the trial judge and dictate that we overturn his in-the-moment determination of

impartiality. The district court thus erred by granting habeas relief to Trimble on the ground that Juror 139 was an automatic death penalty juror.

**IV.**

Trimble also contends that the Ohio Supreme Court unreasonably determined that the admission of guns owned by Trimble but not used in the commission of the murders did not deprive him of a fair trial. During the guilt phase, the trial court admitted into evidence nineteen firearms that Trimble kept in a locked gun safe in his basement but that were admittedly not used in the murders. The prosecution lined the firearms sequentially on two long tables that were placed near the jury box. Shortly after admitting the weapons, the court adjourned for lunch and removed the firearms prior to the afternoon sitting. Then, along with the other exhibits from the trial, the judge allowed the firearms to be brought to the jury room during deliberations in the guilt phase.

The Ohio Supreme Court rejected several of the state's proffered reasons for the propriety of the admission of the weapons, including showing prior calculation and design, ready access to weapons, or familiarity with weapons. *Trimble*, 911 N.E.2d at 263. It eventually noted, however, that the state's argument at trial that the firearms rebutted claims that Trimble accidentally killed Positano had "some merit" and so the trial court did not abuse its discretion by admitting the firearms. *Id.* Further, that court held that the displaying of the weapons and allowing the firearms to accompany the jury during deliberations, while a "highly questionable" decision, was still not an abuse of discretion. *Id.* at 264. Either way, both the admitting and displaying of the weapons amounted only to harmless error because of the overwhelming evidence of Trimble's guilt. *Id.* at 263–64. The district court, noting that AEDPA "sharply limits" review of this claim, did not find the Ohio Supreme Court's determination to be unreasonable.

The Warden first argues that Trimble did not fairly present this claim to the state courts. Before seeking a federal writ of habeas corpus, a state prisoner must fairly present his claim to each appropriate state court by alerting that court to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Trimble clearly presented this claim to the state courts. His argument about the firearms was presented in two separate propositions of law before the state

court.  In one, he claimed that the admission of the weapons violated his right to a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  In the other, he cited four Supreme Court cases to support this proposition.  Like the Court in *Dye v. Hofbauer*, we are convinced that this foundation is enough to satisfy the fair presentment requirement.  546 U.S. 1, 3–4 (2005) (holding that a prosecutorial misconduct claim that featured citations to specific provisions of the Constitution and four federal cases alerted the state court that the claim "was based, at least in part, on a federal right").

As for the merits, Trimble argues that the Ohio Supreme Court unreasonably applied clearly established Federal law from *Payne v. Tennessee*, 501 U.S. 808 (1991).  In *Payne*, the Supreme Court held that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Id.* at 825.  The Court has defined unfair prejudice in criminal cases as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  Trimble contends that the admission and display of the firearms rose to this level of prejudice.

The *Payne* standard, however, is a general rule, and "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Trimble has the unenviable task of proving that the Ohio Supreme Court reached an outcome that falls outside this broad leeway.  He fails to meet this standard, because he has shown us no caselaw to support his contention, while the Warden can point to at least one case in support of her position.  *See United States v. Perrotta*, 289 F.3d 155, 166 (1st Cir. 2002) (upholding on direct review the admission of unrelated weapons even though the government was "unable to explain why the jury needed to see the actual weapons" because "[n]othing in the record suggests that the guns or the fake bomb would have inflamed the jury or inspired them to decide the case on an emotional basis").

Even if there were constitutional error, however, any error was harmless.  A constitutional error that implicates trial procedures is harmless unless it had a "substantial and

injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). As the district court and state court noted, the evidence presented against Trimble at the guilt phase was overwhelming, and included his admissions of guilt to two family members and the police, a recorded 9-1-1 call during the time Trimble shot Positano, a wealth of forensic evidence tying him to the murders, and eyewitness testimony. In the face of this evidence, the impact these firearms had on the jury was at best de minimis. The district court properly denied Trimble habeas relief on this claim.

## V.

Finally, Trimble contends that certain questions by the prosecutor during the penalty phase constituted prosecutorial misconduct. Trimble highlights three specific portions of this phase of the trial. First, the prosecutor attempted to elicit from Trimble's mother that Trimble was discharged from the Air Force by court martial and sentenced to six months hard labor. Trimble's mother, however, asserted that she did not know the circumstances surrounding his departure from the Air Force. Second, in questioning Trimble's mother, the prosecutor attempted to admit evidence of domestic violence in Trimble's previous marriage. Again, Trimble's mother asserted that she did not know about any domestic violence in the relationship. Finally, failing to extract the evidence from Trimble's mother, the prosecutor attempted to elicit from a clinical psychologist evidence of domestic violence in Trimble's previous marriage. In response, the psychologist testified that there was evidence of violence in the relationship.

The Ohio Supreme Court analyzed each statement individually and concluded that there was either no error or that any error was harmless. The prosecutor's questions to Trimble's mother were harmless because they elicited nothing more than a negative response from her. *Trimble*, 911 N.E.2d at 275–76. The prosecutor's questioning of the psychologist, the court concluded, did not result in prejudicial error because it was of "minor significance" in the context of the overwhelming evidence of aggravating factors balanced against rather unremarkable mitigating evidence. *Id.* at 277–78. The significance and harmless-error arguments ultimately convinced the district court to reject Trimble's claim as well.

The Warden once again argues that Trimble did not fairly present this claim to the state courts. Before the state courts, Trimble argued that the cumulative effect of prosecutorial

misconduct during the mitigation phase deprived him of his right to a fair trial as guaranteed by the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin*, 541 U.S. at 32. Here, although Trimble cited only to cases employing state law analysis in his briefing before the state courts, he specifically grounded his prosecutorial-misconduct claim on three Amendments to the United States Constitution. The Ohio Supreme Court must have recognized the federal basis for Trimble's claim, because it cited a United States Supreme Court case in its discussion of the claim. *See Trimble*, 911 N.E.2d at 274 (citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Trimble therefore fairly presented this claim to the state courts.

On the merits, Trimble contends that the Ohio Supreme Court's determination on his prosecutorial-misconduct claim was an unreasonable application of *Darden v. Wainwright*, 477 U.S. 168 (1986). In *Darden*, the Court held that in evaluating a prosecutorial-misconduct claim, a court must determine "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks omitted). Once again, however, the *Darden* standard is a general one. On habeas review, "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (internal quotation marks omitted). In a recent case, the Supreme Court criticized this court because we "cited no precedent of [the Supreme Court] in support of its conclusion that due process prohibits a prosecutor from emphasizing a criminal defendant's motive to exaggerate exculpatory facts." *Parker v. Matthews*, 132 S. Ct. 2148, 2154 (2012). Because "the *Darden* standard is a very general one, leaving courts more leeway . . . in reaching outcomes in case-by-case determinations," federal courts cannot set aside a state court's conclusion on a prosecutorial-misconduct claim unless a petitioner cites to other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable. *Id.* at 2154–55 (internal quotation marks and citation omitted).

Here, Trimble cites to no Supreme Court case besides *Darden* in support of his argument. Although the prosecutor's questions may have been improper, no Supreme Court case authorizes this court to grant habeas relief for prosecutorial misconduct based on questions posed to witnesses about discharge from the military and prior domestic abuse, questions determined by a state court to be insignificant or harmless. We conclude that the Ohio Supreme Court's judgment regarding this claim of prosecutorial misconduct is not an unreasonable application of federal Supreme Court precedent.

Even if there were constitutional error in this case, the error was cured. While we independently believe that any prosecutorial misconduct did not tip the scales against Trimble during the penalty phase, the Ohio Supreme Court's decision to reweigh the aggravating and mitigating factors definitively cures any potential error from the alleged prosecutorial misconduct. *See Moore v. Mitchell*, 708 F.3d 760, 797 (6th Cir. 2013). In mitigation, Trimble introduced evidence of his bipolar disorder and drug and alcohol addiction, evidence that as a child he had been subjected to harsh parental discipline and "mental and emotional maltreatment" from his father, testimony that he was a good and dependable worker and gave assistance to elderly members of his church and his mother, and his apologies and expressions of remorse. Against this mitigation evidence, the state proffered three main aggravating factors: that Trimble murdered his victims as part of a course of conduct involving the purposeful killing of two or more people, that he killed a child under the age of thirteen, and that he murdered Positano while committing the offenses of kidnapping and aggravated burglary. The Ohio Supreme Court concluded, upon an independent reweighing, that the aggravating factors outweighed the mitigating evidence. *Trimble*, 911 N.E.2d at 285. The district court correctly denied habeas relief on Trimble's prosecutorial-misconduct claim.

**VI.**

For the foregoing reasons, we REVERSE the district court's grant of habeas relief on Trimble's juror-bias claim and AFFIRM the district court's denial of habeas relief on the admission-of-weapons and prosecutorial-misconduct claims.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. The Sixth Amendment confers on defendants an absolute right to an impartial jury. Adherence to this constitutional guarantee is literally a matter of life and death in the context of a capital case, where a state may not impose a death sentence if even a single member of the empaneled jury was not impartial due to his or her views on capital punishment.

The issue concerning the "automatic death penalty" juror does not in this case turn on the deference that is rightfully owed to a trial court's credibility determination, as neither party is questioning the juror's sincerity respecting his views on the death penalty. The pertinent issue in this case is whether the juror, given the totality of his voir dire testimony, could reasonably be expected to fairly apply the law when asked to do so by the court. Supreme Court precedent instructs that a juror's affirmative assurance alone, irrespective of credibility, is not dispositive, because "[i]t may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Morgan v. Illinois*, 504 U.S. 719, 735 (1992). It is truly difficult to fathom that any objective party could review the testimony in this case and arrive at the conclusion reached by the majority; Juror 139 repeatedly indicated his preference and belief that anyone who committed murder, and was of a sound mind when they did so, deserved to die and should be put to death. In view of the unambiguous record respecting the predetermined nature of Juror 139's death penalty vote, I dissent from Part III.C of the majority opinion.

**BACKGROUND**

James Earl Trimble, on the evening of January 21, 2005, senselessly killed his girlfriend, her minor son, and a complete stranger, altering irrevocably the lives of many others who endured the loss of their loved ones on that fateful night. Trimble was indicted on three counts of aggravated murder, each including a death penalty specification (*e.g.*, murder of a child under 13 years of age, the killing of two or more people, murder as part of a prior calculation and

design, and murder in connection with a kidnapping). Trimble's trial was split into two segments: the guilt phase and the sentencing phase. In the first phase, Trimble was found guilty on all counts including the death penalty specifications. In the second phase, the jury was instructed to decide, by weighing the aggravating factors associated with each of the murders (*i.e.*, the specifications) against Trimble's mitigation evidence, whether or not Trimble should be sentenced to death. The jury found that the aggravating factors outweighed the mitigating circumstances and accordingly voted for the death sentence. At issue in this appeal is whether one of the empaneled jurors during the sentencing phase of Trimble's trial could serve as an impartial juror by following the law and fairly considering Trimble's mitigation evidence.

Although the majority excerpts a few of the relevant passages from Juror 139's testimony, the majority opinion fails to offer the full context and flow of his voir dire. A more detailed review is necessary because a reviewing court is required to "examine the [entire] context surrounding" the prospective juror's questioning. *Darden v. Wainwright*, 477 U.S. 168, 176 (1986). The following section presents a fuller summary of Juror 139's voir dire testimony.

At the outset, the district court explained Ohio's bifurcated sentencing scheme to Juror 139. The judge asked if Juror 139 could vote for a death sentence if the aggravating factors outweighed the mitigation evidence, and Juror 139 responded, "Yes." (App'x Vol. 5, Voir Dire Tr. – Part 8, at 1312.) He then asked if Juror 139 could instead vote for a life sentence, if the reverse was true, to which Juror 139 responded, "Yeah." (*Id.*) He also affirmed that he would, in general, be able to follow the judge's instructions.

It was then the prosecutor's turn to ask questions. He also began by explaining, for a second time, the separate phases of a death penalty trial in Ohio—first, the guilt phase, followed by the sentencing phase. Juror 139, again, initially said that he understood the process. (*Id.* at 1313 ("Yes, I understand that.").) However, Juror 139's responses to the prosecutor's questioning offered the first indication that he might not be able to follow the law or the judge's instructions, but would instead be an automatic death penalty juror. When Juror 139 indicated that he might be confused about the sentencing phase, the prosecutor asked directly whether Juror 139 thought that Trimble was "automatically . . . subject to the death penalty," if he was found guilty. (*Id.* at 1314–15.) As recognized by the majority, *see* Maj. Op. at 6, Trimble

responded, "If I find him guilty," "Yeah," and "If he killed three people he should [get the death penalty]." (*Id.* at 1315.) Despite his unequivocal response to a direct question that indicated his misconception respecting his duties, Juror 139 again asserted that he understood that "in Ohio the law is that you don't make [the death penalty] decision at that time," *i.e.*, immediately as a result of finding the defendant guilty. (*Id.*)

The prosecutor thereafter explained to Juror 139 for the third time (the prosecutor's second attempt) that in Ohio, sentencing is decided after the guilt phase of the trial. Juror 139 asked a number of questions that indicated his confusion. Yet, the prosecutor pressed forward stating, "You're understanding that right one or the other [meaning life or death] and something that happens after the trial, okay?" (*Id.* at 1316.) Juror 139 assented that he understood that much. But immediately following this exchange, Juror 139 further demonstrated that he would be an automatic death penalty juror. When asked for his opinion on the death penalty, he acknowledged that it served a purpose and then, unprompted, he asked rhetorically, "Because if you take a life why should you be allowed to live?" (*Id.* at 1317.) The prosecutor responded by reminding Juror 139 that a person convicted of murder might be entitled to live under Ohio law. Juror 139 responded, by asking, "Depending on why [the defendant] did it[—committed the murder]?" (*Id.*) It was plain from this exchange that Juror 139 remained confused and ignorant of his obligation to weigh mitigation evidence. For that reason, the prosecutor carefully explained to Juror 139 *for the fourth time* (his third attempt) that the death penalty was only appropriate if the jury had decided during the sentencing phase that the aggravating factors outweighed Trimble's mitigation evidence. Juror 139, again, in very few words, indicated that he supposedly understood the information being conveyed to him by the prosecutor.

The prosecutor next told Juror 139 that it was Trimble's "job . . . to convince you to not vote for the death sentence and [he] ha[s] a right to present that evidence." (*Id.* at 1318.) The judge sustained an objection to the prosecutor's editorializing, as the defense believed the prosecutor was impermissibly suggesting to Juror 139 that there would be a presumption in favor of the death penalty after finding Trimble guilty. The prosecutor rephrased, asking whether Juror 139 would listen to the mitigation evidence and could wait to "make up [his mind] about [the] penalty." (*Id.*) Juror 139 answered, "Yeah," to both questions. (*Id.*) Finally, the prosecutor

asked whether the juror could follow the judge's instructions and return a recommendation for a life sentence if that is what the evidence supported. Juror 139 again answered affirmatively.

Next, it was defense counsel's turn to ask questions. However, Juror 139's responses to those questions plainly revealed his persistent ignorance with respect to a juror's duty to consider mitigating evidence, and in unprompted remarks, he reaffirmed his preference for applying the death penalty to anyone who was found guilty of murder. In response to being asked whether he had ever been called on to discuss his views on the death penalty, he responded not by answering the question, but by clearly stating his view, "I just, if you're guilty, without a reasonable doubt, then if you take somebody's life your life should go—you shouldn't be allowed to live either." (App'x Vol. 5, Voir Dire Tr. – Part 9, at 1321.) This response constituted the third time that Juror 139 had made an unequivocal statement indicating that he would be an automatic death penalty juror. He followed up by confirming that his mindset as a juror would be "[a]n eye for an eye" and "[w]hat goes around comes around." (*Id.* at 1322.) Juror 139 made clear in no ambiguous terms that Trimble deserved to die, so long as he was found guilty.

At this point, defense counsel explained to Juror 139 *for the fifth time* (his first attempt) that in Ohio a death penalty trial involved two stages, and that a jury, necessarily, could only decide whether Trimble should be sentenced to death after the jury had already found him guilty of aggravated murder with the death penalty specifications, and that the later determination regarding the penalty was separate and apart from Trimble's guilt. The defense counsel meticulously walked through the guilt phase of the trial—explaining to Juror 139 that in order to find Trimble guilty on all counts, the jury would have to find that the prosecution met its burden of establishing each of the death penalty specifications: the killing of two or more people; that the murder was part of a prior calculation and design; and that one of the murders happened in the course of a kidnapping. Defense counsel thereafter explained that it was only at this point, after the jury had found Trimble guilty of aggravated murder with the death penalty specifications, that the jury could weigh those specifications against Trimble's mitigation evidence and decide if he should be sentenced to death. When asked if he understood after each step of the explanation, Juror 139 simply replied, "Yeah," or "Uh huh." (*Id.* at 1322–25.) At the end of that dialogue he offered his understanding of process:

> If he knew—what you guys are saying, if he already knew what he was doing, or whatever, then he should get the death penalty. But if he's like for some reason off and whatever, then maybe just prison or something like that, is that what you mean?

(*Id.* at 1325.) It is evident from this statement that even after defense counsel's thorough explanation—*the fifth explanation* that Juror 139 had received—Juror 139 continued to conflate the guilt and penalty phases. He failed to comprehend that mitigation evidence was distinct from potential affirmative defenses to aggravated murder at the guilt phase of the trial, such as insanity or mental incapacity. Juror 139 previously stated as much during his voir dire to screen for bias from pretrial publicity: "From what I understand that he's already guilty, but he's just trying to figure out if he's—if it's insanity or not." (App'x Vol. 5, Voir Dire Tr. – Part 8, at 1303.) Juror 139's view was simply that if Trimble was guilty of aggravated murder then he should be sentenced to death.

Defense counsel made a final attempt to resolve Juror 139's misconceptions. He explained to Juror 139 *for the sixth time* (and at great length) the distinctions between the guilt and penalty phases of a capital trial—specifically identifying to Juror 139 what was so troubling about his previous explanation of the penalty phase. Defense counsel highlighted for Juror 139 that the jury would necessarily have to find that the murders were planned and purposeful prior to the penalty phase, if the jury was then being asked to weigh mitigation evidence in consideration of the death penalty. Juror 139 thereafter made a final attempt to explain his understanding with respect to whether he would be an automatic death penalty juror—that attempt failed just as clearly as had his earlier attempt at offering his understanding of his role on the jury. He stated:

> If he knew what he was doing at the time, had a clear head, knew exactly, planned out, then he should get the death penalty. But if he was under the influence or something, or not quite right in the head, *if you can prove that*, then maybe it shouldn't be so harsh. Either way is bad but then you get the prison time.

(App'x Vol. 5, Voir Dire Tr. – Part 9, at 1329 (emphasis added).) Defense counsel shortly thereafter concluded his questioning; presumably believing that he could easily have Juror 139 removed from the jury pool as an automatic death penalty juror.

At that point, the judge explained to Juror 139 *for the seventh time* the distinction between the two phases of the trial because he "just want[ed] to make sure" that Juror 139 truly understood the process. (*Id.*) He then asked whether Juror 139 knew that it was his obligation to follow the court's instructions. Juror 139 replied affirmatively, just as he had at the very beginning of his voir dire testimony. The judge found that Juror 139's testimony overall supported a finding that Juror 139 would consider the mitigation evidence and that he would follow the court's instructions, and on those bases, the judge overruled defense counsel's objection that Juror 139 should be excused for cause as an automatic death penalty juror. There is no reading of these facts under any standard of review that should lead a reasonable and objective person to conclude that Juror 139 would be able to faithfully execute his duties on the jury by impartially sitting in judgment and following the law, which would require him to consider the possibility of a life sentence even after he found that the murders were committed by an individual who was of a sound mind and who had planned the killings in advance.

## DISCUSSION

### I. Standard of Review

As an initial matter, it is worth addressing the standard of review. Despite the majority's contentions, the law of this Circuit clearly commands that *de novo* review applies to a case such as this one, where the state court did not consider the claim on the merits because it only applied plain error review after incorrectly finding that the claim was procedurally defaulted.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to habeas cases only where a state court has reviewed the petitioner's claim on the merits. *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Jackson v. Smith*, 745 F.3d 206, 209 (6th Cir. 2014) ("[C]laims not 'adjudicated on the merits' by the state court are given plenary review by a federal habeas court, even where AEDPA otherwise applies."); *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004). In this case, as the majority concedes, the state incorrectly applied its procedural default rule. It therefore applied plain error in reviewing the trial court's failure to remove Juror 139 for cause.

Plain error review "is not equivalent to a review of the merits"; rather, it "is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice." *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *accord Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014) ("We have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference."); *see also State v. Mammon*, 13 N.E.3d 1051, 1070 (Ohio 2014) ("We take notice of plain error with the utmost caution, under exceptional circumstance and only to prevent a miscarriage of justice." (internal quotation marks omitted)). Thus, this Court has a well-established precedent of declining to review claims as being procedurally defaulted when the state court has only reviewed the claim for plain error, relying on the rationale that the state court never reviewed the claim on the merits. *See, e.g.*, *Taylor v. Mckee*, 649 F.3d 446, 450–51 (6th Cir. 2011); *Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007); *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006). *Lundgren* forecloses any notion that plain error analysis constitutes a review on the merits. The only case relied on by the majority to suggest otherwise—*Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009)—is not controlling because it was decided later in time, and one panel of this Court cannot overrule the published decision of a prior panel. *United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000) ("[T]he earlier determination is binding authority unless a decision of the United States Supreme Court mandates modification or this Court sitting en banc overrules the prior decision."). AEDPA is plainly inapplicable and the majority's attempt at injecting ambiguity into our Circuit precedent is completely unconvincing. No deference is due to the judgment of the state's appellate courts that reviewed the issue only for plain error. *Lundgren*, 440 F.3d at 765.

A juror's ability to impartially apply the law is a factual issue, *Franklin v. Anderson*, 434 F.3d 412, 426 (6th Cir. 2006), and the "trial court's findings of juror impartiality may 'be overturned only for 'manifest error.'" *Mu'Min v. Virginia*, 500 U.S. 415, 428–29 (1991) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961))). However, manifest error simply means that there is clear and convincing record evidence that the trial court's decision was incorrect. *Irvin*, 366 U.S. at 724–25.

## II. Analysis

"Jurors who cannot apply the law are not impartial." *Franklin*, 434 F.3d at 427. Thus, "[a] juror who would automatically vote for the imposition of the death penalty without weighing the aggravating and mitigating evidence presented must be removed for cause, and a failure of the trial court to do so rises to the level of constitutional error sufficient to grant relief." *White v. Mitchell*, 431 F.3d 517, 538 (6th Cir. 2005). This Court has no choice but to reverse a sentence where a biased juror has been seated. *Franklin*, 434 F.3d at 427. Furthermore, attempts to rehabilitate a juror will not suffice when it is clear that the juror has failed to comprehend his responsibilities, *id.*, because this Court's inquiry "does not end with a mechanical recitation of a single question and answer." *Darden*, 477 U.S. at 176.

The majority frames this issue as concerning the "special deference" due to a trial judge's credibility determinations, because only the trial judge is in the position to take note of a prospective juror's "demeanor" and "body language." Maj. Op. at 12. That contention is unpersuasive in the context of this case. Demeanor and body language are only relevant when the juror's credibility is at issue, typically, because the testimony is inconsistent, the juror's answers are ambiguous, or because the trial judge has indicated that credibility is an issue. None of those factors are present in this case. The trial judge did not invoke credibility as being at issue; he simply determined that Juror 139's attempts to explain his understanding of the sentencing procedure, along with his affirmation that he would follow the judge's instructions, were sufficient to overcome his statements indicating a clear preference for the death penalty. This determination, to credit certain snippets of testimony reflecting Juror 139's willingness to follow instructions over his clear and unequivocal expression of his views on justice meaning "[a]n eye for an eye," (App'x Vol. 5, Voir Dire Tr. – Part 9, at 1322), does not reflect a credibility determination. *See Morgan*, 504 U.S. at 735 ("It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so."). And the majority's contention that Juror 139 was not an automatic death penalty juror simply because he "never expressed doubts as to whether he could follow the law," Maj. Op. at 13, is clearly incompatible with the Supreme Court's guidance in *Morgan*. Because credibility is not at issue, no special

deference is due to the trial court's judgment. In this case, the panel was only called on to decide whether there was clear and convincing evidence that the trial judge erred in declining to remove Juror 139 for cause—and that evidence is manifest.

The majority is only able to reach its conclusion through its strained employment of out-of-context quotations from cases that it designates as the metes and bounds of Sixth Circuit death penalty jurisprudence. Relying on *Bowling v. Parker*, 344 F.3d 487, 520 (6th Cir. 2003) as the linchpin comparator case of its independent analysis, the majority contrasts Juror 139's plainly deficient explanation of his duties (conflating mitigation evidence with mental incapacity) to a strikingly similar explanation offered by the juror in *Bowling* who was found not to be an automatic death penalty juror. *See* Maj. Op. 14. However, the majority conveniently omits from its opinion that the juror in *Bowling* clarified himself immediately following the troubling statement by testifying that he would consider all of the mitigating factors, all of the possible sentences, and that he "definitely [did not] want . . . [to] see someone take the death penalty." 344 F.3d at 520. Juror 139's views on the death penalty were in polar opposition to this expression of understanding by the juror in *Bowling*.

In this case, all of the evidence indicates that Juror 139 single-mindedly favored the death penalty and that he would possibly consider a life sentence only if the defense could prove that Trimble "was under the influence or something, or not quite right in the head." (App'x Vol. 5, Voir Dire Tr. – Part 9, at 1329.) This artless statement, Juror 139's best and final attempt to conform his views to the prevailing law, is entirely devoid of any indication that Juror 139 would consider any of Trimble's mitigation evidence. Moreover, Juror 139's responses make clear that the only circumstance in which he would consider a life sentence was one where Trimble, by definition, was not guilty of aggravated murder with the death penalty specifications. This plainly incorrect recitation of his duties, which stands in direct opposition to Trimble's constitutional right to an impartial jury, squarely resolves the issue before this panel. *Franklin*, 434 F.3d at 426 ("[T]hat [the juror] would consider all of the evidence does not remove the fact that she also seemed to expect some of that evidence to come from [the defendant] by way of proof of his innocence."). This case is controlled by *Franklin* in that Juror 139 "was biased because [he] could not understand the law rather than because [he] had a preexisting opinion

about [the defendant]." *Id.* Much like the juror in *Franklin*, Juror 139 impermissibly placed a burden on the defense to prove that Trimble had the right to live. *Compare* (App'x Vol. 5, Voir Dire Tr. – Part 9, at 1329 ("But if he was under the influence or something, or not quite right in the head, *if you can prove that*, then maybe [the penalty] shouldn't be so harsh.") (emphasis added)), *with Franklin*, 434 F.3d at 424 ("If the jury would listen to both of the lawyers, you know, and whatever evidence they had *to prove him not guilty*, I'd sit here and listen to it.") (emphasis added).

The majority contends that the most important thing to consider is that the trial judge thought Juror 139 had been rehabilitated simply because he offered affirmative responses when asked whether he would consider mitigation evidence and whether he would follow the court's instructions. However, Juror 139's affirmative responses to rote questions are an insufficient basis alone to uphold the trial court's judgment. *See Darden*, 477 U.S. at 176 (affirming that a reviewing court's inquiry "does not end with a mechanical recitation of a single question and answer"); *see also Franklin*, 434 F.3d at 428 ("While we appreciate the judge's attempts to rehabilitate this juror, he had a duty to dismiss a prospective juror who could not follow the law."). When the testimony is viewed as a whole, it is readily apparent that Juror 139 constituted an automatic death penalty juror. There is no indication that Juror 139 could follow the law and serve as an impartial juror by considering Trimble's mitigation evidence, other than his laconic responses affirming his purported understanding—*e.g.*, "yeah," "uh huh," "right," and "I understand that." (App'x Vol. 5, Voir Dire Tr. – Parts 8 & 9.) On the other hand, Juror 139 was particularly forthcoming when he expressed his pro-death penalty stance in no uncertain terms:[1] "If he killed three people he should [be sentenced to death]"; "Because if you take a life why should you be allowed to live"; "An eye for an eye, all that"; "What goes around comes around"; "Yeah, I just, if you're guilty, without a reasonable doubt, then if you take somebody's life your life should go—you shouldn't be allowed to live either"; "[I]f he already knew what he was doing, or whatever, then he should get the death penalty. But if he's like for some reason off and whatever, then maybe just prison or something like that." (App'x Vol. 5, Voir Dire Tr. – Parts 8 & 9.) These undisputed statements demonstrate with no room for ambiguity or serious debate that the trial judge made a manifest error in judgment that cannot withstand constitutional

---

[1]The following statements are presented in chronological order.

scrutiny. The evidence is beyond clear and convincing that Juror 139 constituted an automatic death penalty juror because he expressed a pro-death penalty stance and proved incapable of recognizing his duty to consider mitigation evidence at the penalty phase of Trimble's trial.

Seeing no rational basis for overturning the district court's judgment granting habeas relief, I respectfully dissent.